The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. We're prepared to hear argument in our first case, and Mr. Snyder, whenever you're ready. Good morning, and may it please the Court. Maryland operates a diverse system of public higher education, diverse both in terms of student enrollment and in terms of the institutional options that are available to students. The system consists of 13 schools, four of which are historically black institutions, Morgan State, Bowie State, Hopkins State, and the University of Maryland Eastern Shore, which we'll refer to as UMES. And there are nine non-HBIs. Maryland's non-HBIs are fully integrated, with African-American enrollment ranging from a little over 11% to almost 40%. Some, like the University of Maryland University College and the University of Baltimore, are actually a majority of minority institutions. In fact, UNUC... But the HBIs aren't fully integrated, are they? They are in the sense that they have significant other race enrollment, ranging from 16% at Bowie to about 33% at UMES. So not in the same way as the non-HBIs. They're not as integrated. And we know from Justice Thomas's concurrence in Fordyce that the HBIs continue to this day to have a particular appeal to African-American students. There was testimony in this case about how, for many African-Americans, going to an HBI is a dream come true, both for themselves and for their children. So it's something that has a very strong draw on the African-American community. Then we have schools like UMUC that was created in the 1940s after World War II that was never segregated at all. It always admitted African-American, white, and students of other races. Focusing specifically on Maryland's HBIs, the district court highlighted the state's unflagging commitment to its African-American students and the far-ranging initiatives it had taken to maximize their access to and success in Maryland's public higher education system. The court found that Maryland has maintained a policy of enhancing HBI admission or HBI mission and programming since at least the 1970s. And it applauded the state's commitment to funding its HBIs at levels above those for other institutions to the tune of $84 million over a 25-year period before trial, which goes to half a billion dollars in excess funding if you exclude the highly financed flagship institution, University of Maryland College Park. This picture bears no resemblance to the type of de facto segregation that the court had before it in Fordyce. In Fordyce, the Supreme Court had before it in the 1980s. How much is this remedy going to cost? The estimates are that the remedy would cost a little over a billion dollars. And we also know that the remedy is highly unlikely to succeed in boosting white enrollment at the HBIs because in case after case that has ordered- What would you do with the money if it weren't- But where's the money going to- How is the remedy going to cost that additional amount? Well, that dollar amount is an estimate that was provided by plaintiffs during the remedial part of this litigation. And when you're creating- the remedy was to create new high-demand programs at the HBIs. And that means you have to hire new faculty, you have to sometimes create new space, perhaps there's new buildings involved. It's not just a matter of- But you've done that at non-HBIs. You have created new programs in demand at non-HBIs. And we've done it at HBIs as well. That happens naturally throughout program development in Maryland. The problem with it as a remedy that's designed to try to get at increasing other race or white enrollment in particular at HBIs, we know from these other cases that it doesn't have that effect. So you said it's- that's going back to your argument earlier that it's highly unlikely to succeed. So what would succeed? The defendants suggested more funding targeted at recruitment and marketing, other race scholarships, financial aid package. So has the state been doing that? Other race scholarships are tricky after- That sounds like no. Well, we did do it in the early 1970s and we were trying to do it with College Park in the 80s, but that was challenged. And this court in the Podboreski case said that Maryland could not have another race scholarship program for the University of Maryland College Park because- So are you saying that nothing will succeed? No. If ordered by a court, other race scholarships, that seems to be something that all experts agreed would have that effect, could bring in white students to the HBIs. You challenged both liability and remedy. Yes. That's correct. That is correct. Just assuming for purposes of argument that liability was established, if you were to assume single race scholarships violated due process and the Equal Protection Clause, what would be your remedy proposal after that? Our remedy proposal, if you eliminate that, would be money for more recruiting and marketing. When you already see that, when you go to, for example, BWI Airport, there are these very large banners advertising for Morgan. I mean, they are reaching out and not just reaching out to the African-American community, they're reaching out to everyone to have a more diverse enrollment. But we could augment that, other things like that. But we know from the testimony in this case- The thing about it is the system of higher education operates so differently from a system of elementary and secondary education. With elementary and secondary education, you have students that are assigned to certain schools by a higher authority, the school board, and then they must go to those. But with higher education, you have a system where students are not assigned. They choose what institution they wish to go to. Did the district court make any finding that the university was trying to steer students away from HBIs and into TWIs? No, the district court did not find that Maryland was channeling students on the basis of race, discouraging white students from seeking admission to HBIs. What she found was that program duplication has an effect, not a channeling effect, but says it has an effect on choice. And if you have only one choice and then you have two, okay, you've got a different choice. More importantly, she faulted the system for not providing white students with enough of an incentive to attend an HBI. Not that the state was discouraging or preventing white students from attending to HBIs. And that's the standard that Knight uses after Fordyce. And when you look at Fordyce itself, it's talking about limiting, restricting, substantially restricting the student's choice. She didn't say that Maryland was doing that. The district court concluded that the state was not giving white students enough of an incentive. And that's not what Fordyce is about. Fordyce is about states that are operating a date factor. Fordyce is about traceable policies. Right. And that's what establishes liability, isn't it? It's not incentives, it's whether there is a policy in higher education that is traceable to a de jure system. Right. It's not an effects test, it's a traceability test. And that's what you eventually have to prove, that not effects, but that the policy itself is traceable to the de jure era. Correct. And in the de jure era, as we know from Fordyce, and I'm sure plaintiffs will remind you, program duplication was part and parcel of the de jure system. You couldn't have a separate but equal system unless you had duplicated programs. That was the charge of Plessy versus Ferguson. So it was there for the purpose of separating the races. That's what Justice Thomas points that out specifically in Fordyce, that the type of program duplication that the court is trying to get at is duplication that separates the students on the basis of race. The duplication at issue here, even if it's traceable in the sense that you had duplication now, you had duplication then, is not the kind of duplication that the court's trying to get at in Fordyce because you don't have that channeling effect here. And you don't have it here for a number of reasons, probably principle of which program duplication is the only policy that the court found to be traceable in Maryland. So all you're doing with program duplication, on its own, it doesn't have a channeling effect. Instead of giving a student, you have only one choice of where to attend, you now have two choices of where to attend. It doesn't put the finger on the scale about which school to go to, and it certainly doesn't do that on a race basis. You have to have a large amount of duplication to give the students that attend an institution a complete education. Right. Duplication exists across the country. It's important in order to meet changing workforce demands. It's important in order to give students options so that they don't leave the state if they're dissatisfied with the options that are available to them. So it happens across the country. It's an important part of the higher education system. It only is a problem when it is being used to separate the students on the basis of race. And we know that's not the case in Maryland. Did the state propose a funding solution? In terms of remedy? Yes. We did. That's where we talked about improving recruitment and marketing. It seems like the state really didn't come to the table on the remedy issue for, well, at all or much. If we reverse the district court on the remedy issue, what assurances would the court have that the state would come to the table and participate in finding a new solution this time when it appears from the record that the state wasn't that interested the last time? Well, the state was interested in coming up with a solution to this problem. And the things that they proposed are the things that the experts had all agreed at the trial were effective at boosting white enrollment. So I don't think you have to worry about the state coming to the table if a remedy is necessary here. But, again, it's really more about liability, this case. Fordyce teaches us that racial identifiability by itself is not constitutionally actionable. It's not a problem. If it's the result of free student choice, that's okay. That's what Basimore holds. There you had two 4-H clubs, state-sponsored, that were 100 percent black and white. And the court upheld that there was no constitutional violation there because the state was not channeling the students to the different clubs on the basis of race. It was just the students' free choice. So in this case, where we have no traceable policy found by the district court other than program duplication, and on its own, program duplication doesn't affect student choice, we are in the same situation as Basimore. How can that be a traceable policy if the state has been changing policies in an effort to get away from the de jure era? I see that I'm out of time. Can I answer your question? It's not traceable in the sense that we have a current policy that is designed to get at program duplication and guard against it. And that policy, the district court found, was constitutionally adequate and was functioning properly. So we don't have a current traceable policy of program duplication at all. So how do you find liability? You don't. Okay, thank you. Mr. Jones, I'm happy to hear from you. Good morning, Your Honors, and may it please the Court, I will be addressing the district court's finding of liability on unnecessary program duplication. Mr. Greenbaum will address remedies and the cross-appeal. The district court held after a six-week trial which featured dozens of witnesses and hundreds of exhibits that unnecessary program duplication drives the fact that Maryland's HBIs are more segregated today than they were in the 1970s and the absence of duplication drives the fact that one of the HBIs, UMES, has a white population more than three times a percentage higher than the other HBIs. Mr. Jones, I had a number of questions looking at the evidence that seems to bleed back and forth between questions of liability and questions of remedy. So I don't mean to take you out of your science course, but it's sort of hard to split the two of them evenly. But certainly the core versus non-core classification had some impact on the liability finding, and there were a number of items that I would have expected to see, and I may have just missed because, you know, this is a huge record, that it did not appear were addressed that might have some relevance. So, for instance, there seemed to be a shortage of STEM-related courses that I would have expected to see in a 21st century curriculum analysis for core versus non-core. Do you know if that was looked at as a factor at all? Well, what I would say about that, Your Honor, is at the liability phase, the state presented no expert of its own to present an analysis of the extent of unnecessary program duplication in Maryland. And as a result, the court had before it Dr. Conrad and the deposition of the state's expert that they had designated, Dr. McHenry. One of the things that we point out in our brief, that the state chose not to call Dr. McHenry to testify, because he said that he, in fact, agreed with Dr. Conrad in terms of, and this gets to your question, in terms of the definition of unnecessary program duplication and also in terms of what the appropriate remedy is. And that's at the docket 456 at 18, he was specifically asked. The court would still have to find the expert testimony to be credible, and it was under a duty to examine it on its own. So, for instance, in today's curriculums, there are a number of disciplines where master's degrees are now the entry-level document that you need. Is that a factor that was looked at at all? Well, as I say, Your Honor, under the standard definition of unnecessary program duplication, that is what was used in Fort ICE, and that is embedded in the state's regulation and that their experts agree on, is that master's program... I understand that part, but Fort ICE is almost 30 years old, and we're looking at a case that deals with higher ed in the 21st century. And I would think that there would be some changes that would have occurred that an expert today would have to look at that they would not have looked at three decades ago. That's right, Your Honor, and Dr. Conrad did say that the definition, that his assessment of what's core has developed over time, and I believe that the trial court took that into account. But it's kind of a moving target, isn't it, as to what is core and what is non-core? I mean, these are highly disputable questions, and I think the state contends that in some instances, nursing, business, accounting, engineering, computer science programs are all non-core, which would prevent any kind of duplication. But if courses that are this critical, business, accounting, engineering, and computer sciences are all non-core, and then thereby preventing duplication, aren't you depriving both African-American students and white students of a complete education? Because these would seem to be courses that anyone going to any college would want to take, and I don't understand what the criteria are for core and non-core courses. It seems to be such a moving target for me, and by designating so many courses to be non-core, you're depriving students, in many instances, of a chance to get a rounded and complete education. So, if I can respond to that, you know, there are two parts of it as I interpret it. The first one, in terms of the definition of what is a core program, as I said at the outset, there really was no dispute at the trial level what the definition of unnecessary program duplication was. A core program are all programs necessary for a liberal arts and science education, and all courses at the master's and the graduate level are considered non-core, and therefore, unnecessary program duplication. At the trial court level... But how do we decide what's necessary and what's not? Well, Your Honor, the time to argue that would be at the trial court level where experts debate whether something is core or not core. And the state had no experts. The state had no experts because their expert, as I said, agreed with Dr. Conrad. And the state is trying to relitigate on appeal issues that it lost. And then I can get to the second part of your question, Your Honor, in terms of choice. The state is also trying to rewrite Fordyce. The argument that unnecessary program duplication deprived students of choice was essentially the argument that Justice Scalia wrote in dissent. His argument was that the state only needed to eliminate discriminatory admissions policies at the TWI and that unnecessary duplication, in fact, increased choice, but no other justice signed on to that. What you need to show under Fordyce is a policy that's priceable to the jury era. And one question I have in connection with the legal standard, because there are a lot of policy questions here, but the question I have with respect to the legal standard is, have the HBIs been denied programs that they have requested? Yes, Your Honor, there was some of that in the record. And in terms of the legal standard, if I can just say this, two things about it. But where is that finding? Because the state is saying that HBIs were not denied programs that they requested. Well, one of the specific things that the judge found was, the supporters are aware, that after Maryland entered into the partnership agreement with the Office of Civil Rights, where it agreed to address the segregative effects of the existing duplication, that between 2000 and 2008, the court specifically found and addressed in her opinion that the state seemed to favor the TWI with respect to unique high-demand programs. I want to get back to my question. I'm sorry. When the HBIs requested a program, was it denied by MEHC? Well, Your Honor, that's really what I was trying to get at, that during that period, the state favored TWIs with unique high-demand programs, which the court found to be highly suspect in light of the state's history. Well, but there were only, am I correct about there were only two of 1,250 programs reviewed that were actually approved over an HBI objection? Well, two things about that. Number one, the HBIs are part of the system, and one of the documents that the court focused on was a letter that they wrote complaining that their programs were being systematically duplicated, but they did not want to be seen as the authors of that letter because of concern about retaliation. But I'm just trying to get to this policy, which I'm uncertain about, because I thought that the presidents of Bowie and Koppin had testified below that the current MHEC program approval process was adequate. So, Your Honor, two things. Number one, the program approval process is different than existing duplication. The Fifth Circuit in Ayer has made a point of saying the state bears the burden of proving that present-day duplication is defective and found liability for the existing duplication, even though the program approval process was. So what is the traceable policy? The traceable policy, Your Honor, as articulated in two important pieces of evidence that the district court relied upon were two Maryland Attorney General's opinions. The traceable policy is existing duplication. In Ayer, the district court – I'm sorry, in Fordyce, the Supreme Court specifically said that the continued existence of all institutions is itself a traceable policy. The court specifically also said that existing duplication – But doesn't that get us into an effects test rather than to a policy determination? A traceable policy? I see that my time is up. No, no, go ahead. Please. Yes. So that specific issue was addressed in a spring 2005 memo by the Attorney General's office where he specifically warned the state that it was vulnerable legally under the policy dealing with unnecessary program duplication. And a similar memo from 2005 – When you say that, but what policy? Is there anything that the state is doing? I mean, what policy is the state following if it approves? Because the district court rejected the idea that we would dismantle some programs and shift them over and shift programs from one institution to the other. So that's not available. And if the programs requested by HBIs are being approved and they're not approving programs over HBI objections, and furthermore the district court found that there was no discrimination in funding because adequate levels of funding would seem to be what you would use to dismantle any effects. And if HBIs are receiving as they certainly should, adequate levels of funding, what is wrong with giving the institutions adequate funds and letting them develop programs with those funds in accordance with their mission statements, which again the district court said Maryland was allowing the HBIs to craft for themselves? I mean, it seems to me that if you're not going to dismantle programs and shift them all back, that the answer to it is funding and letting the HBIs develop with the funds they receive the programs that they would have as most useful and that the state seems to be approving upon request. If I can respond briefly to that, please. I think it's important to keep in mind how unnecessary program duplication causes segregated effects. The night court talked about that I think in footnote 404 and the district court did too. During the de jure era, the state stigmatized the HBIs in a variety of ways. So because of this stigma, white students, Asians and Hispanics for that matter, will not go to the HBIs if they can get the same programs at a TWI, and the court found that those programs exist without sound educational justification. And Maryland's history from the 70s proves that out, as does the facts on the Eastern Shore. Now, in the other cases, whether it was Knight, Ayers, Fortis, there really was not a discussion about whether the HBIs had objected to the duplication or whether the HBIs had a program first or the TWIs had it first. But aren't you, counsel, aren't you talking about effects rather than a traceable policy? Because I thought that was the distinction that Fordyce used, that you had to show some kind of not just a traceable effect, but a policy that was in some way traceable to the de jure era, and it seems to me the policies are aimed at eliminating unnecessary program duplication. Well, your Honor, as I'm sure the court is aware, in Fordyce there was no discussion of the program approval process at all. The discussion was about existing unnecessary program duplication, and Fordyce specifically mentioned that, the possibility of eliminating the duplication. In this case, the district court said that concluded after hearing all the evidence, including what you call the consensus among the Maryland higher education officials, that the way to block the segregative effect of unnecessary program duplication is, Mr. Greenbaum will talk about in more detail. Well, if you talk about eliminating program, unnecessary program duplication, I just wonder about it because there is so much dispute about what core and non-core programs are, and you set up another kind of inequality where an African-American student who goes to an HBI might be able to get a certain program, and an African-American student who goes to a DWI would not be able to take advantage of that same program, and so you have a... Right. And the other question I have, Counselor, and I hope you don't mind my giving you some extra time. Not at all. Because I enjoy hearing from you. Thank you. But I just don't see this. I have real questions, and we're supposed to look at whether a remedy holds any chance of working, and it does seem to me that students choose colleges and universities for reasons that don't have anything to do with program duplications or whatever. For example, in some instances, you can get more of a scholarship at some institutions than others. You can get a better student loan. You can get a lesser tuition. Other institutions are where your friends go or where your family goes or what's nearby or whether it's a small college or whether it's a large college or whether you like the beauty of the campus or whether you want a rural setting or a more urban setting. And as I say, it's different from elementary school. And I just... I really... We're going to throw a whole lot of money at something that, it seems to me, I'm not sure that that's going to really have any kind of tangible effect, because isn't the answer here to make certain that the HBIs are adequately funded? They play such an important part in the overall Maryland system of education, and no one disputes how valuable and worthwhile they are. But I'm wondering if the answer is to just make sure, both now and down the road, that the HBIs have adequate funding to carry on the mission statements that they have crafted and allow the HBIs to spend the adequate funding in a manner that best develops their own mission and their own appeal and that responds to what they perceive as student demand rather than what a special master is trying to engineer. And, you know, the Supreme Court is taking court decrees and special masters with a great degree of skepticism. And I just wonder if, at the end of this 10-year period of receivership, whether it's going to make any difference or produce the kind of changes that we would all hope for. This is my question. I can't see it. I'm just not sure it's going to do any good. Your Honor, the liability trial focused on student choice, what are the kinds of things that affect student choice. The district court held that unnecessary program duplication of programs have a demonstrable effect on student choice. That conclusion was aided by admissions from the state's expert, Dr. Hossler. And if I could just be allowed to share that with the court. And the HBIs only have 11 unique programs and the PWIs have an overwhelming And then that disparity increased by the time that you got to the liability remedy trial. And, in fact, that's the reason why, in a way, what makes this case so egregious. The students that may want to go to a PWI instead of an HBCU have overwhelming choice. They can get everything they want at the PWI, pretty much. That's right, Your Honor. Okay, I'm sorry to interrupt. No, no, that's okay. So what I was going to share with that response of Judge Wilkerson's comment or question about whether it would work or not, that specific question was asked of the state's expert, Dr. McHenry. The question, you agreed that an important step in dismantling a dual system higher education is to strengthen the institutional identities of the HBIs. He said, yes. He said, do you agree with Dr. Conrad's conclusion that enlarging their unique high-demand programs and enhancing their mission will do this? He said, yes, let's dock at 456 at 8. So the fundamental thing that's going on here is that the state is trying to relitigate issues of liability. They've made strategic choice recognizing that the consensus of experts in the field, Dr. Lichtman is not one, but the consensus of experts in the field and the acknowledgement of the Maryland's own officials, including the Attorney General, the former chairman of MHEC, who signed the partnership agreement, the consensus was that unnecessary program duplication is hurting the HBIs because it is keeping them segregated. In fact, they are more segregated than the HBIs in Mississippi. The district court in Ayers concluded that the white population of the HBIs averaged 15% in the early 2000s, and I've shared with you what the numbers are in Maryland. So this issue about the remedy and student choice, in effect, was all litigated in six weeks in the liability trial, also in the remedies trial. As Zach had pointed out, the state chose not to call its own remedial expert, and then they backtracked. They would have proposed every remedy except for the one that they agreed was educationally sound and partnership-free. So I don't know. I'm well out of time. I'm happy to answer any more questions. We took a lot of your time. We're sure going to give you some extra. Well, we're giving you the extra. I think I've answered the questions. Mr. Jones, you can make a concluding statement. I like to give litigants the last word. Thank you, Your Honor. The concluding statement I would make is that there was no clear error in the district court's factual conclusions, and the district court's legal analysis is fully consistent with Fordyce, Knight, and it's also consistent with the two memos by the Maryland Attorney General, including the one where it specifically warned the state that it was vulnerable legally under Fordyce. Thank you. Thank you, sir. Mr. Greenbaum, we'd be pleased to hear from you. Thank you, Your Honor. As Mr. Jones had said, I'm going to be addressing the remedy as well as the cross-appeal. So let's start with the remedy. The remedy here, the design of the remedy, is to desegregate and desegregate by undoing the violation. What is the record evidence that the remedy will – what change in the composition of the student bodies of the school will the remedy produce? Well, the court is not supposed to come up with exact numbers, but the idea is – How about a range? One percent, two percent, five percent? The court's been very careful not – you don't see percentages in Ayers and in Alabama, but the idea is several percent, maybe back to where these schools were in 1975, Your Honor. What I'm asking for is what the record reflects. The record does not reflect an exact number, Your Honor, because what happened – Does it reflect anything about the likelihood that change will occur, and is there any empirical evidence for that? Yes. What is it? The empirical evidence – well, there's a lot of evidence, including empirical evidence. I don't want to just limit to that, but we'll start with the empirical. The experts, plaintiff's experts, did an analysis showing that we're unique in high demand, particularly out on the eastern shore, where all the graduate programs out on the eastern shore are unique programs or joint programs. Twenty-nine percent of the students attending graduate programs on the eastern shore, again, all unique or joint programs, are white. That gives you a baseline in terms of even at the eastern shore, the overall percentage of white students is 13, but for the graduate programs, it's 29. So that's a piece of empirical evidence. If you look at the programs that had the highest percentage and most number of white students, they were all approximately unique programs in the system. So that is some of the empirical evidence. My question is, is there any type of cost-benefit analysis done here? The states represented the cost would be a billion dollars. What do you get for the billion dollars you spend? Well, first of all, Your Honor, the estimate that the state had, which the judge found to be inflated, included a lot of things that the judge did not order as part of the remedy, including transfer of dozens of programs. So the state's estimate is way out of bounds in terms of what the judge actually ordered. Whatever the dollar amount may be, that's got to come from the education that applies to all Maryland students in institutions of higher education. What I'm still asking for is, at the end of the day, if you pursue that remedy, where is the evidence that that makes any difference? Oh, sure. So I'll give you an example, and we have record evidence of this on the record, of Tennessee State, in which there was, as part of the remedy, unique and high-demand programs going to Tennessee State, the only HBCU in Tennessee. Today, Tennessee State's white population is 24% of its student body. More white students go to that one institution, Tennessee, than in all the Maryland institutions combined. In terms of the percentage of white students in graduate programs, 40%. There are programs in Tennessee, high-demand programs, for example, its physical therapy program, where 93 of the 106 students in that particular program are white students. Was there a special master in Tennessee? Your Honor, all of the cases had either monitors or monitoring committees. The specific term special master may or may not have been used, but in all these cases, it played out over a period of time where you had somebody, usually somebody with some background in education, working with the judge to try to come up with a remedy that worked, and the remedies played out over time. There were remedies. If you look at some of the history of these cases, you have some remedies that were tried during different periods of time and then modified. So, for example, the original unnecessary program duplication remedy. The bottom line is that the higher education system is put under some sort of federal court order for the next 10 years. What I'm concerned about is that there are already extensive regulations of higher education from the Department of Education, the Department of Justice. Individual institutions are regulated extensively by MHEC. So then we have another set of dictates, and it seems to me there are so many different levels of regulation and blankets and administrative directives and everything. It just becomes an entanglement that is increasingly making it more difficult to run an educational institution. Your Honor, you're talking about a constitutional violation here. You're talking about Equal Protection Clause. You're talking about Maryland's failure to dismantle a policy or practice that goes back to the era of de jure segregation. I'm not sure. They did dismantle it. In fact, what they did was they used to have ad hoc funding formulas, and then what they did was ad hoc funding. It was done on a very, very discretionary basis without any kind of mutual criteria or not. But beginning in 1968 and periodically thereafter, Maryland has shifted to specific formulas. And in the course of shifting to those specific formulas, you had unrebutted evidence that the HBIs had more square feet per student than the non-HBIs. Less physical plants that were bigger and newer, less deficiencies in laboratory space. And I'm just wondering why the answer, because Maryland has taken important steps to try to eliminate these effects, but I'm wondering why the answer doesn't lie in appropriations rather than a 10-year special master plan, which seems to me a real gamble in terms of whether it's going to do anything or whether it's not. Why did not this case settle on an appropriation that would allow the HBIs the discretion to spend funds in furtherance of what they themselves conceived to be their optimal educational mission? Why do we have to go the route of a special master and a 10-year court supervision? Your Honor, I'm out of time. Do you mind if I answer the question? Oh, sure. Go ahead. Okay. So unfortunately I can't talk about it. I could spend weeks talking about what's happened in terms of settlement discussions in this case. Well, we can't give you that because then another snowstorm will come. But let's start with the fact that there is a constitutional violation here and that there needs to be a mechanism to fix that constitutional violation, to desegregate the HBIs. And, yes, funding has got to be a component of it to actually fund the programs that are going to desegregate the HBIs in the way, in the path. If you look at what was happening in the 1970s, HBIs were headed towards a path of desegregation. Percentages of white students at the HBIs were much higher because you had programs like the MBA program at Morgan and programs at some of the other schools that were attracting students of all races. But then what happened is Maryland duplicated those programs. And once they duplicated those programs, the HBIs, their white population quickly disintegrated to the point where it's literally half of what it was 40 years ago. And we've seen many examples and we've provided many examples to the court, both in Maryland and elsewhere, where HBIs have been successful in attracting students of other races. You say they haven't duplicated the programs, but, you know, we've been through the approval process, and it does seem to me that any university could object. And the objections to duplication that HBIs raised were as they should have been, respectful. Well, the record, Your Honor, in terms of the state being responsive to HBI objections is poor. As was demonstrated in the record with respect to the 1970s, the University of Baltimore coming into the system with respect and duplicating the MBA program at Morgan and others. The attempts by the HBIs to block PWIs from having duplicative missions of those HBIs that MHEC denied. In the 1980s, originally MHEC was going to allow Morgan to have exclusive engineering programs in the Baltimore area, and instead they went back on that. They allowed UMBC to develop another cohort of programs, with UMBC getting help from College Park actually seeding those programs from the flagship university of the campus. It created that over and over and over again, the system has actually made decisions that have gone against the HBIs. That's something that was reflected in the 2005 letter from the four HBI presidents. It was reflected in a 2016 op-ed that all four HBI presidents signed. So you've had a series of events. If you go to the court's opinion, the court talks about the series of events where Maryland went down a certain path that ended up in the HBIs not being what they could be today. I have one question I want to make. All the parties have seemed to refer to the differentiation of student ratios as something of a binary choice. You have white students, you have black students. Yes. Like in Fort Ison or other related cases, the demographics of those states would perhaps support that. Here you have a fairly large segment of the population that fits into neither category. How are they accounted for? Well, let's put it this way, Your Honor. 98.6% of the white students in Maryland attend TWIs. Over 99% of the Hispanic students in Maryland attend TWIs. Over 99% of the Asian students in Maryland attend TWIs. So you group all racial categories except blacks in the black category? You can group it however you want. You can talk about it. I'm not using the crazy option that I've seen in briefs and record. I'm just trying to figure out who goes into what group. Well, the point here, Your Honor, if we had a situation where let's say Latino students and Asian students and African-American students attended HBIs and white students did not, I would still say that under that set of facts, if you have a policy or practice that's traceable and that has a segregated effect, that that would be a violation. This is a circumstance that in my mind is worse, that the white students, the Hispanic students, the Asian students, they go to the TWIs, they don't go to the HBCUs. So in that sense, no matter how you group it, you have a situation where the HBCUs are not attracting white students, they're not attracting Asian students, they're not attracting Latino students. Where the state gets its numbers from, the primary driver of that are foreign students. And both this court and prior courts made clear that you can't use foreign students as a means of saying that you don't have a segregated situation. Foreign African-American students? Some of them are African-American, some of them are not. But in any event, you can see with foreign students, it's them not really sort of being part of the whole issue of segregation and stigma and all these things. All of this comes from the fact that this dual system was set up in the de jure area, and all the courts have said that a critical part of the dual system were duplicated programs. Duplicated programs were an essential core part. The state had the responsibility to dismantle, the affirmative responsibility to dismantle. It's different than a typical 14th Amendment claim where the burden is on us. So basically in Maryland, we can just drop the H because it's not historically correct. Well, yes. And in fact, I mean, if you look at how Maryland, Maryland likes to say when there's litigation, talk about HBIs and non-HBIs. But when you actually look at their documents, they do refer to the schools as HBIs, TWIs. There's a document I was looking at this morning that's in the record where it just referred to the TWIs as white schools. So those historic designations, particularly for the HBIs, have existed until the present. And everybody in Maryland knows who the HBIs are and who the TWIs are. Even if what's happened with some of the TWIs over time is that their demographics come closer to mirroring the demographics of the student population, everybody still knows that distinction. And the stigma that came from Maryland never really giving, starting off the HBIs in a situation of disadvantage. And one of the things that's unique about Maryland is there was a lot of, there was report after report after report in Maryland going all the way up through after this case was filed in 2008, talking about how the system had been set up in such a way to disadvantage the HBIs. And with respect to the particular issue where the court found a violation, unnecessary program duplication, as my colleague Mr. Jones had said, documents in the mid, an agreement, an acknowledgment of Maryland in 2000 that had to deal with this issue, its failure to deal with this issue, two opinions from the Attorney General's office talking about the fact that this remained a problem and it's persisted and persisted and persisted. And what cases do you have where district court has found no liability with respect to mission statements, no liability with respect to funding, and where there have been significant changes in the funding process and the approval process that liability and a sweeping remedy can be superimposed on the system on the basis of, on the basis of unnecessary program duplication alone? Well, as you know, Your Honor, there have only been, there are only a handful of cases that deal with higher ed segregation and only two of them really in the post-Fordyce era. And in both of those, there were multiple findings of liability. So, yes, this case is not Ayers and it's not Knight, which had multiple levels. You have the one thing, I mean, you have two findings of non-liability against you. And we've read your brief and you've lodged a cross-appeal as to those and you certainly haven't weighed any of that. But I'm just querying where we get a remedy that requires, whatever case law has this sort of remedy when findings of non-liability have been made with respect to funding and with respect to mission statement. You know, I just, I'm not sure I see it in the process. Your Honor, first thing I would say is, I can't think of a case where somebody's, where a defendant's violated the Constitution. And the court said, because you've only violated the Constitution in one respect, there should be no remedy for that. If you have concerns about the extent of this remedy, you can, and, you know, one of the things about the remedy is the abuse of discretion standard. And I fully believe that this judge has acted under her authority, you know, after a seven-week trial, after dozens of witnesses, and in our view, her opinion is well-supported. She gives a whole set of reasons as to the different, as to the remedial theory. The specifics, in terms of, some of the specifics were not outlined and she explained that a good part of it was that the state engaged in a process of not letting our experts talk to the HBIs. I think you're, I appreciate your argument. I think you're dodging this last question. Well, what I would, as you know, Your Honor, there have been two post-Fordyce cases in this area prior to this one. In either case, did the court make a finding of liability on just one issue? So I can see that point. But I will say, I don't see that as being a weakness. I see that as being a difference. And what I would say is, if you look at those two cases, particularly with respect to unnecessary program duplication, the court said, okay, the current program approval process is fine, but you still have not dismantled that program. Here we are in 2018, you're talking about something in the 1950s. Is there ever going to be any ending point? It's going to go on and on and on. And the state and its higher educational system is going to be under court supervision for years and years and years. And because there's never going to be any concession on your part that the effects of this have ever been dismantled. Even given the extraordinary changes that have been made by Maryland in practically every area that we've talked about, even including the program duplication. But I don't see the end point in this.  Judge, and I know that you're very familiar with the K-12 DSEG area. I would say that this is different. And I know that some of those desegregation decrees that have been in place since the late 1960s and early 1970s continue. This is different. Maryland, number one, has not been under court supervision at all. They have not been under court supervision under this for one day because the judge wanted the appeal to go forward in this case before actually starting down the remedial process. So that's the first point. Second point is, she set a limit on this remedy of 10 years. And yes, it's possible that the plaintiffs, as in any other case, can petition the court and ask for a longer period of time if they don't think the remedy has been effective. But the burden would be on us. It would be odd to me if the case did not settle in terms of appropriations and funding and the kind of things that would have alleviated the need for yet another layer of supervision upon higher education. But we don't need to go into all that. And all I would finish with saying, Your Honor, is that you've made the point and understandably about how there are ways that Maryland can fix this. But the fact of the matter is it hasn't. It's violated the Constitution. The students of Maryland are entitled to a remedy for that. The students have a choice of some wonderful institutions. And what the courts have said in the higher education context is, it's not really a choice if what you've done is you've stigmatized the HBIs in such a way that you are discouraging students. And the mere fact of the idea that having a program in the HBI is not good enough for all students. I find that to be patently offensive. And that's essentially what the state is saying is, it's okay for us to duplicate here because the TWIs need to have it too. We need to give students more choice. When instead, if what they would have done is allowed the HBIs to reach their potential,  then students would have had the real choice, as they did in the 1970s, of attending HBIs that offer things for students of all races, that offer a good education for students of all races. And what the state is implicitly saying is that the HBIs can't do that. And that is the impression that they are leaving everybody with. Well, we'll check it all against the record. Thank you, Your Honor. Thank you. Mr. Snyder, let's hear from you. It would be helpful if you could tell us succinctly, in a nutshell, what is your best argument in terms of liability? What's my one best argument? Yeah, let's hear what you have to say. On a macro level, my best argument on liability is that Fordyce is about systems that have come into court and said, sure, we have a de facto segregated system, but we have race-neutral admissions policy, so we've done enough. Fordyce makes crystal clear that that's not enough. You can't have policies working in the background that channel students on the basis of race. Maryland obviously makes no effort to separate students on the basis of race. It's a very diverse student body at the non-HBIs, and the HBIs, despite plaintiff's arguments to the contrary, are becoming increasingly diverse with other race enrollment. And if you want to look at the details of that, it's in the record in the MHEC data book that sets out foreign students, Latino students, African-American students, white students. You can see the breakout from all those different institutions. What about their argument of stigmatizing the HBCUs over the years? Stigmatizing is a difficult issue to get into because you immediately start trying to tease out. Let me just ask you, what is an urban university? An urban university is one that Morgan's purpose is to be the educational engine of Baltimore City, and it's a purpose that Morgan's president testified eloquently about how he embraced that. If there's an educational engine of Baltimore City, how many unique programs do they have? Honestly, I don't have that number off the top of my head. They have some. They have architecture, a couple others, and about that unduplicated program. So I guess architecture is what is meant by that they must have programs that are urban-oriented? That architecture is urban-oriented? I think the idea of being architecture is building buildings. I mean, he's claimed that it must be an urban university in order to grant, okay, we'll let you grant doctorates, which as of 1994, there was only one doctoral program. But you have to call yourself an urban university and provide urban-oriented programs. That sounds stigmatizing to me. I don't know what that means. It means that it's a recognition of the- What's the University of Baltimore? Are they urban-oriented? I'm not sure that that's in their mission, but Towson is the metropolitan university, also city-related. But there was some talk about appropriating money. I think Judge Wilkinson, you were talking about isn't this just a matter of appropriating money for the HBIs and letting them pursue their own programs as they see fit? That's what's already going on. On this record, we know that the HBIs are being sufficiently funded. We know that they're not being frustrated in the development of programs. The record is clear that they've not been denied any efforts to develop new high-demand unique programs. The record also shows that on only three occasions since 2000 has Maryland Higher Education Commission approved a unique high-demand program at a non-HBI over the objection of an HBI. The HBIs already have the authority and the discretion under Maryland law to develop the programs that they see fit. The state through MHEC is not frustrating them in that. They're not standing in their way. The tools are already there for the HBIs. Now, when you talk about the numbers, 122 to 11 is what plaintiffs talked about, you also have to recognize that there's more non-HBIs. There's many more students in there. Does the Department of Higher Education in Maryland disagree with the Attorney General's opinion in Maryland that the higher education system was in peril of running afoul of the case law in this area? I think what the plaintiffs are referring to there, it's not a formal opinion of the Attorney General. It's one Assistant Attorney General's advice given to his agency client. And who was his agency client? It was the commission. And that person advised the commission that approving the Towson MBA program over the objection, over Morgan's objection, might leave the commission legally vulnerable and might bring a lawsuit. And it was pressure, of course, because that was the impetus of bringing the suit. But even in that situation, the two schools that were cooperating to develop the, let me go back one step first. When Towson was first developing that program, they came to Morgan and asked Morgan to partner with them. And Morgan declined for perfectly fine reasons. They just didn't want to do it. So they went to UB. Those two schools together are, UB is majority minority. Towson has, I think, 37% nonwhite enrollment. They're very diverse institutions. So this is not, even this kind of, this classic example that it's sometimes referred to, is not an example of, I see that my time's up. Can I finish answering the question? It's not an example of steering students to white schools and to black schools. Maryland today is just not like that. It's not like Mississippi in 1980. It's a very different demographic world. And we know that soon, probably within the next decade, Maryland's going to be a majority minority state. So the black-white binary dichotomy that you see in the Knight case and the Mississippi case really doesn't even apply here in Maryland. Let me mention, let me just ask you one thing. I think everybody here wants to see a flourishing, diverse system of education in which PWIs or HPIs, rural universities, urban universities, are all free to develop their own potential and their own particular mission statement where they can do the most good for the students that they serve, each and every college. So I keep coming back to the question, why is this remedy necessary for all of this? Why do we have to have a 10-year receivership and a special master? The special master seems to me to be something of an appendage or something, just an unnecessary additional layer. Why can't the, why isn't the answer here to allow the HPIs a measure of self-government and according to the mission statement which they have crafted and to develop themselves in a manner that is going to be the next educational benefit to many, many students in Maryland? But why do we need a special master in all this? Why doesn't the answer lie in funding, which is already seen to be adequate, but why doesn't the answer lie in funding and then leaving it up to the good judgment of those HPIs to develop their own image and their own brand and attract students in the way that they see is fit? Why do we have to have this special master and this receivership and all of this? It just seems to me like additional baggage and bureaucracy and everything that just is going to tie up everything in acrimony for years to come. And why isn't the answer in a greater degree of funding and a greater degree of self-governance? The HPIs already have that. They, on this record, they're already adequately funded. In fact, more so when compared to the non-HPIs. They set their own missions. They spend the money how they see fit. So they have discretion at every step of the way. And having a special master receivership over the next ten years doesn't, it's not even just another layer of bureaucracy. It casts a shadow on all of the institutions within the system who then can't plan for the future in the same way that they would otherwise be able to because they would have to worry, well, maybe that program won't be approved by the special master or something. It frustrates the other institutions, HPI and non-HPI, development of their programs when you have this additional layer of bureaucracy. Unless you have any other questions? Thank you. Thank you. Mr. Greenbaum, you have some time. Thank you, Your Honor. So let's start with the fact that I know you have a concern about the special master. Maryland had an opportunity before litigation to resolve this. I think the Supreme Court will have problems with a remedy that is disintrusive for this long a time and imposes this kind of authority in a single individual and the bureaucracy that grows up around them as opposed to the educational structure of the state. I just, the way I see it, that these broad equitable decrees over state educational institutions and federal equitable decrees over state institutions are running into real skepticism with the Supreme Court. And it's just my hunch. What do I know? But I'm just expressing to you my concerns. And, Your Honor, what I would say is that part of what's happened here is that Maryland has engaged in a series of steps prior to litigation, during litigation, and during the remedial phase that there needs to be some level of court oversight, whether it's a special master or whether it's an alternative that, in your view, would be a less draconian alternative. There needs to be some means of remedying this constitutional violation. What do you suggest is the alternative? Well, we did suggest a special master, but you could have something that... I mean, you seem to be open to alternatives. Well, sure. Like what alternatives that are less draconian are you open to? Well, you could have it set up that the HBIs have more independence than they do right now, structural independence than they do right now. So, for example, three of the four HBIs don't have their own board. Their board is the University System of Maryland board. Morgan does have its own board, and it gives Morgan more of a measure of independence when you look most of the time at who's publicly objecting to things. It's Morgan State because, structurally, they do have more independence than the other schools do. If one of the other schools gets out of line, gets too aggressive, that president gets too aggressive. So they can't really spend the funding however they want the way the state said. The state said nothing to see here. They've got funding, and they can carry out their mission statements the way they want. Of course it doesn't work that way, Your Honor. I mean, in terms of mission statements, let's talk about mission. Briefly, the court, interestingly, said that the present-day missions are historically linked to the past mission, the de jure mission, but yet it wasn't traceable, which is inconsistent with what you see in heirs and knight with respect to traceability. Yes, HBIs do the first draft of their own mission statements, but they go through an approval process. They have to be consistent with the state charter of education. They have to be consistent with the state plan. So Coppin can't just say that, okay, we are going to become the flagship university of Maryland. They can put that on a piece of paper, but that's not going to go very far. And then during Mr. Snyder's time, you heard him talk about Towson being the metropolitan university versus Morgan being the urban university. The mission is duplicated. Like that you're telling Towson- The word urban versus metropolitan is stigmatizing, could be seen as stigmatizing. Yes, and, Your Honor, you might have been alluding to this when you were talking about this earlier. Morgan had a number of programs that were denied because what the state said is, these aren't urban programs and you're the urban university. And so, you know, what you have here is, and look, there are ways to be flexible in terms of remedy, but in the end the remedy has got to address the constitutional violation and you can't expect that Maryland is going to do it alone because it hasn't. Report after report from the state has talked about this problem. They entered into a partnership agreement with OCR where they made the commitment that they were going to create unique and high demand programs at the HBIs and not duplicate. They didn't do that. We've been engaged in this litigation the last 12 years and Maryland hasn't solved the problem. There needs to be some level of oversight and some level of- that there needs to be either structural change and or a good deal of- Part of the difficulty is in elementary and secondary education, much of the problem is solved by revising student assignments and you could get a greater degree of desegregation through assigning students to separate schools, but in higher education you just don't have that option. And it's an incomparably more difficult problem because students do choose the school they wish to attend and no remedial program that I've heard of would deprive them of the choice to attend the institution of higher education that they feel can be most beneficial. And so it's just a- it's a knottier problem in that sense. Yeah, Your Honor, and what I would say is in terms of talking about choice, what Fordyce and the cases following it say is choice works a little bit differently in the higher education setting. It's not- because as you pointed out, students have the ability to go to every school, but it's about making that choice a real choice. And we've seen instances, like in Tennessee, where what happened as a result of a deseg decree was you had both the programs and the support of those programs that were created at Middle Tennessee State and you have it being a school that students of all races are choosing to go to, particularly at the graduate level, particularly in the medical field. And that's what we're looking to do here to resolve this constitutional violation. Thank you. I want to thank all of you for your arguments. And we'd like to come down and shake hands with each of the advocates and then we'll take a brief recess. Judge Wilkerson, can I make one final observation? Yes, Judge Agee would like to make a final comment. Having now listened to the parties for about an hour and a half and on my hundreds of pages of briefs and evidentiary record, I've read in preparing for this case my unsolicited thought, which is not a judicial opinion, it's just my commentary, is that this is a case that should have settled years ago. Both parties have unrealistic expectations and demands and it would behoove the parties and the people of Maryland if you gave it another realistic shot because what you get from the federal courts, however many years it takes, may be something that neither party wants to have. And that's worth what you paid for it, which is nothing. But that's my observation having gone through all this. Thank you very much. Appreciate that. This Honorable Court will take a recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, Stephanie D. Thacker